May it please the Court, my name is Tim Tracy, and I represent the Appellant, the Christian Legal Society, or CLS. The Court below held that it is no burden to force CLS to bestow the privileges of leadership and voting membership on students who disagree with the group's core religious beliefs and values. You know, your job here today is to distinguish truth. There's nothing else you can or need do. So why should you do that? Sure. I mean, tell us why this case isn't controlled entirely by... I'm happy to do that, Your Honor. I think there are a number of reasons. First and foremost, the truth be count was limited to the question of general membership, which was the equivalent of attendees. They had no power to vote. You know, you said that in your 28 general, but I don't understand the point at all. Maybe you can explain. The way I see it is both here and in truth, people were denied certain privileges on account of religion, on account of this requirement, whether they were privileged of calling themselves a member or whether to be an officer. The point is they were not treated the same as other people. How is that materially different? I mean, how is your case materially different from... I think it's materially different because, well, my first distinction being that truth is about attendees. This case is about voting membership and leadership, and attendees don't have any power to affect the expression of the group. So for the school district to compel truth to have open attendance didn't affect their expression, but here for Hastings to tell CLS you have to bestow these privileges of leadership and voting membership on people who disagree with your religious beliefs and values directly affects the expression of the group. So the people will elect and remove officers who amend the Constitution, who vote on chapter business, and teach the Bible studies.  I think the other distinction, Your Honor, from truth is that the truth club was seeking to be, quote, school-sponsored. CLS is not. It cannot be both factually and legally. Hastings specifically disclaims responsibility for student organizations and its policies. In fact, it places an affirmative obligation on them to tell their members. Let me show this. You say CLS is not seeking school-sponsored? They don't want the money? Well, let me explain what I mean by school-sponsored. Yeah, I mean, you know, they're not turning down the money, right? Well, the question, they're seeking the benefits of recognition, which include funding, yes. Okay, so you think funding is not sponsorship? I mean, are you usually those? I do think that, Your Honor, and I think that because of three cases the Supreme Court decided, Rosenberger, Southworth, and Velazquez. And in Rosenberger, the university argued just as Hastings does here, which is in granting benefits and specifically funding, that they were in some way subsidizing or promoting their own message. In Rosenberger, the Supreme Court rejected that argument. It said this isn't a subsidy case like Regan or Rust. This is not a case of the university promoting its own message by recognizing student organizations. Rather, it's promoting a diversity of viewpoints from private speakers. And Hastings has stipulated in the record at 337 that what it's trying to do here is to promote a diversity of viewpoints among student organizations, including viewpoints on religion and human sexuality. Southworth says the same thing, and that's at 529 U.S. at 229. And the Rosenberger discussion is at 515 U.S., 841 to 840. I'm sorry, I'm just not following. Nobody's stopping this group from existing, right? I mean, as best I can tell from the record, they can even use school facilities to meet. What they can't do is get money, and they can't use the e-mail system to advertise their meetings, right? I mean, they can't use the facilities of the school to help them advance their message. It's true, Your Honor. Nobody's sort of going around breaking up, you know, Christian legal society's meetings. Some of the people are going around sort of kicking them out, right? There's nothing like that going on, is there? Well, Your Honor, it's true that the group can meet informally on campus, but that was equally true in Healy v. James, where students for a democratic society could meet on campus informally, they could meet off campus, they could distribute literature, and yet the Supreme Court held that there was a burden on their associational rights. It was true in Widmar that the group could meet a block from campus. It was true in Christian legal society v. Walker. The Seventh Circuit said the CLS chapter could turn to alternative channels of communication, and they could turn to alternative meeting spaces, but yet there was still a burden on the First Amendment rights of CLS. Well, I don't see how you can call it a burden when what they want is they want to use school facilities. They want the actual money. They want to use facilities that the school has, you know, its resources to advance its message. This is not somebody stopping them. This is them not getting the benefit of these additional resources, and I don't see how you can equate that with stopping the speech. They can speak all they want to. They can stop students in the corridor and talk to them. They can pass the word around by cell phone or AIM or, you know, any other way about meetings they might have, but they can't use school facilities. And that's just like truthless county. I don't think it is, and I don't think that's what truth is about. Truth does not turn on the analysis of, well, this is somehow an indirect burden. Truth turned on the question of whether forcing truth to open its general membership burdened its expression. It said it didn't because these people couldn't affect the expression of the group, and it relied on Sue v. Roslyn Union School District and said, look, there it affected the expression because it was talking about leaders, and here it doesn't because these are just attendees with no power to affect the expression of the group. And I think the other thing that is important to note, this shouldn't be looked at as, well, this is just a benefits case. The Supreme Court has never analyzed, even in the funding of student organizations in Rosenberger and Southworth, and the Supreme Court has said that this is the university opening up a forum for private speakers. May I? I'll pick up on that. I think we all agree that this is a limited forum case. Now, you stipulated, if I read it right, that Hastings prohibits any group from adopting provisions barring individuals from leadership positions for holding views contrary to the mission of the group, including barring Republicans from leadership positions in the Democratic Club, as an example. That was a specific stipulation. Now, that may not make a lot of sense to expressions of diversity, to say that every group has to be infiltrated by its adversaries, but nonetheless, you stipulated to that. Why is this not a content and viewpoint neutral regulation in a limited forum, which says we're messing up everybody equally? I think it's not, Your Honor, because the record shows at 271 to 301, where all the student group constitutions are, that there are other groups who say we want you to agree with our mission. That's an equal protection argument. I don't think it is. I think it's a viewpoint discrimination argument, where the Hastings is saying that these people can say, we want you to agree with our mission and viewpoint, but the religious group can't. And the Walker Court recognized that that sort of uneven application is viewpoint discriminatory. And I think the Truth Court said that, saying, if you can show us that this policy is unevenly applied. That's why it remanded. That's why it remanded. That's correct. But that was not an equal protection argument. They were saying, in truth, they're saying you can't discriminate on the basis of religion. And the group there said, Truth said, yes, but you're discriminating on the basis of gender, because you have men's honor societies and women honor societies. And that was sufficient under summary judgment to create a tribal issue of fact. And it was remanded. Right. Now, here, that situation doesn't occur, unless you're claiming unequal protection. If you're saying La Raza can limit itself to Hispanics, but we can't limit ourselves to Christians, then you may have an equal protection argument. But I don't see that that is a violation of your expressive association ground or free speech. I think it is a violation, Your Honor, because what the record shows is you have people like Hastings Democratic Caucus saying you can agree with our beliefs, but a religious group can't come in and say, we want you to agree with our religious beliefs. And I see that I'm out of time, Your Honor. Thank you very much. May it please the Court, Ethan Shulman, Folger, Levin, and Kahn for the Hastings College of the Law, FLEs. The Court's argument appropriately started, of course, with the effect of this Court's decision in Truth v. Kent School District. Which is still subject to a petition for certiorari. It is indeed, Judge Beyer, which I understand will be filed today. Be that as it may, it is the slate that we write upon today. We're not writing on a clean slate. And what it establishes, of course, is that we're dealing here with a limited public forum, as you said earlier, Judge Beyer. What it establishes is that where a public university or law school makes benefits available to student groups, recognition and funding, on the basis of a nondiscrimination policy that is applied uniformly as it is here, that restriction or that requirement is subject not to strict scrutiny, as CLS argues, but to the limited forum analysis. And the two prongs of that test, of course, are that the policy must be content and viewpoint neutral, and that it must be reasonable in light of the purposes of the forum. So let me, if I may, briefly address each of those issues. It's clearly content and viewpoint neutral here. What we're dealing with is a nondiscrimination policy that's not unique, it's not unusual, it's akin to the nondiscrimination policies that are in place at thousands of educational institutions across the country, and in many state and federal jurisdictions across the country as well. It doesn't depend on the content of the speech of the student organizations, nor on their viewpoint. I recognize there's been an interesting debate in some of the cases about exactly where one draws the line between content and viewpoint. Regardless, in this case, nothing about this policy turns on whether a student group is religious in nature, is political in nature, or has a particular viewpoint on any particular subject. As Professor Volokh says in his article, a student group can have atheist views, it can have religious views, it can have pro-gay rights or anti-gay rights rules or views, rather. It's still subject to this policy. So there's really no legitimate question here that what we're dealing with is content and viewpoint neutral. I should pause to say that when counsel argues that there's... Well, some kinds of groups are more susceptible to this kind of rule, or find that kind of rule more intrusive than, or may find the rule more intrusive than other groups. So the chess club, you know, you don't really have a pledge that, you know, I think chess is the greatest game in the world, you know, I forswear backgammon or whist, you know. You know, it just doesn't make much difference in most... I think most groups are very happy to have people join and, you know, if they want to be there, that's fine. There are certain groups that are much more susceptible to that. Political groups certainly are one possibility, but I would think that religious groups are probably the most susceptible. So you could have a rule that's content neutral, that across the board seems neutral, but it affects different groups very differently, and a group that's dedicated to religious worship, and not just religious worship, but a certain kind of attitude towards religion or towards, you know, personal relations to the deity, would feel very much impacted by this kind of rule, whereas other groups wouldn't. So I'm not sure that, as a priori matter, the argument that, well, you know, I apply to everybody is... I mean, I'm not just swayed as Professor Wallach is. Well, let me address that, Justice Kuczynski. Of that argument, yeah. Yeah, it's an important point, and it's one that has... Again, we're not writing on a clean slate. It's one that's come up. The courts say that even though a rule is viewpoint neutral or content neutral, it doesn't necessarily mean that it has to affect all groups equally. Madsen is a very good example, where what you're talking about is an injunction against anti-abortion protesters outside abortion clinics. Obviously, that regulation falls in some disparate way on people holding a particular view. But that doesn't make... That doesn't, the Supreme Court said, violate the viewpoint neutrality requirement. And similarly, if one looks, for example, and shifting slightly to the expressive conduct area, you think about O'Brien. Well, a regulation prohibiting persons from destroying or burning their draft cards falls disproportionately, presumably, on people who hold anti-war views and engage in that kind of conduct with that view in mind. But again, it doesn't affect the core point that it is viewpoint neutral on its face. I should add that there's no evidence in this record... Well, O'Brien isn't quite on point. O'Brien really did prohibit conduct. He did. Whereas this really does deal with belief. I mean, it's a subtle point, but it's sort of an important one. Because, you know, the school has a rule against discriminating based on religion, but they truly, in a strict sense, don't discriminate based on religion. If you're a Jewish and you want to sign a pledge, you know, which I would guess most Jews wouldn't, just as an example, they would let you in. So this is sort of discrimination based on a failure to or unwillingness to take a certain position. Let me disagree slightly, Judge Kaczynski, because, first of all, if one looks at the truth case, the Court said that an essentially identical religious criterion inherently excludes non-Christians. I checked on that. You're right. But even... Truth is completely on point. Okay. And totally parallel. That's why I asked the question. But let me add just... But this is stepping back from... So that we have a clear record, you know, in fact, I don't know that it would be the case that a Jewish student or a Muslim student who chose to sign the Statement of Faith would be accepted. In this record, we have a group that has expelled Mormons, for example, on the ground that they don't hold beliefs that this group views as consistent with its... what it views as the orthodox view of Christianity. You know, beyond that, of course, we have the sexual orientation point here. There is no question in the record here that this group bars across the board any openly gay and lesbian student at Hastings from joining this group. There's no real dispute about that. There can't be any dispute about it. It's in the stipulation and it's in the... They don't bar repentant homosexuals. That is the claim, Judge Bea. May I ask you... I want to interrupt this point. Mr. Tracy distinguished Truth v. Kent School District from this case because he said, if I understood him correctly, in Truth there was no effect on expressive association since the attendees and general membership were addressed. Here there is voting membership addressed and barred, and therefore the Christian society cannot express its Christian views because it cannot elect Christians to leadership societies. Is that not a distinction? It is a factual distinction, Judge Bea, but as we like to say, I think it's a distinction without a difference. There's no way... There's nothing in the Truth decision that I'm able to find that turns on that distinction. The court, in other words, the basic holding of Truth as I read it, is what we're talking about here is a restriction on a limited public forum, and that's the test that must be applied. The court doesn't find there's no burden on expressive association. It says, in fact, expressly in the majority opinion, we're dealing here not just with a group that wishes to associate, but a group that wishes as a school-sponsored matter to associate. And regardless of the semantic debate about what sponsorship means in this context, there's no question here that what we're dealing with is a subsidy. It's a financial subsidy. It's a subsidy by way of making public facilities available and the like. Beyond that, of course, when the court refers to Hsu, the Second Circuit opinion, and it does so, by the way, only in its statutory discussion, in the discussion of the Equal Access Act, not the discussion of the constitutional issues, it says very approvingly, well, Hsu said a membership requirement that's based on a religious criterion would plainly be insupportable. So even Hsu, which is sort of three steps removed from where we are here, doesn't support the position. Beyond that, Judge Bayh, I wanted to refer back, if I may, to your reference to the stipulation, because, as you say, one may regard it as silly, but Hastings not only enforces a nondiscrimination policy, it enforces an open membership policy. That is a policy that requires all student groups to be open to all students, regardless of either protected status or even regardless of belief. And not only open membership, but open leadership. And open leadership as well. So the colloquy about is there an equal protection claim here, the answer is no. There's an undisputed record here that although some of these student groups do, in fact, have constitutions that state their objectives or their missions, the record is undisputed that those are not regarded as membership criteria that groups are free to enforce and to bar members or bar leaders who disagree with them. And, in fact, that has never occurred. The La Raza example, for example, that Your Honor raised, the question was raised during this very litigation about that group, which seemed to indicate that there was some type of an ethnic barrier to membership in that group, and that was quickly clarified that that group had no such intention, the Constitution was amended, and there's no evidence that that ever happened. So there's no basis here for an equal protection claim or any claim of unequal protection. It's so hard to control if you're required to have an open membership. How can you control that kind of thing? You know, a bunch of people can join, and then they elect their leaders, right? Right. Anyway, your time is up. Thank you. Okay.  Thank you, Your Honor. I think, first and foremost, my opposing counsel is incorrect about the standard that applies here. The fact is, with an expressive association claim, the test the Supreme Court has laid out is whether it affects the association's ability to advocate public and private viewpoints. And if it does, strict scrutiny applies. So the applicable level of scrutiny here is strict scrutiny. The whole question of, is this viewpoint neutral and reasonable, that is a free speech question that applies. It does apply to CLS's free speech claim, but it has no applicability to CLS's expressive association claim. And even in that context, when you're in a free speech context, when you ask, is it viewpoint neutral, is it reasonable, if it is, you then apply strict scrutiny. You look at Rosenberger, Lambs Chapel, Good News Club. In each of those cases, they find viewpoint discrimination, and then they ask, well, does the school district or the university have a compelling interest in avoiding an establishment cause violation? So the proper thing for the Court to do here is to apply the proper test to the proper claim with the right level of scrutiny. So do you think it would be prudent for us to withhold submission in this case pending what I understand will be the subpoena in truth and the Supreme Court's ruling on it? I think if the Court wants to do that, it can. I don't think it's required to, because I do think truth is distinguishable. I understand it's neither required nor prohibited. I was asking whether you think it would be prudent for us to do that. I'm asking for your view as to... I think it may well be the prudent thing for the Court to do, is to wait to see what the Supreme Court does. Mr. Shulman, do you agree? I don't, Your Honor. And the reason I don't, if I may, is this case has already gone through, as the Court knows, a lengthy delay. One does not know how long it's going to take the Supreme Court to resolve a certiorari petition, assuming one is final. And this case does present different issues and different facts, and I think the Court should address them. Well, but the Hastings policy as it stands now is in full effect, right? It is, Your Honor. You have a few seconds left. Did you have anything else to say? I've got nothing further, Your Honor. Thank you. Okay. Well, we will confer. We will not, and we'll issue an order either submitting or withholding submission after we've had a chance to confer a conference. Thank you. Okay. Thank you, counsel, for a very useful argument on both sides. Very helpful.
judges: Kozinski, Hug, Bea